O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| Christopher Scruton, | CASE NO. SA CV 11-1148-JST(MLGx) |
|---|---|
| Plaintiff, | |
| vs. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Ethicon, Inc.; Ethicon, Inc., doing business as Advanced Sterilization Products; Ethicon, Inc., doing business as ASP; Johnson & Johnson, | |
| Defendants. | |

**I. Introduction**

Before the Court is a Motion for Summary Judgment, or, in the alternative, Partial Summary Judgment ("Motion") filed by Defendants Advanced Sterilization Products Division of Ethicon, Inc. ("ASP"), Ethicon, Inc. ("Ethicon"), and Advanced Sterilization Products Services, Inc., ("ASP Services") (collectively "Defendants"). (Mot., Doc. 33.) Plaintiff Christopher Scruton ("Plaintiff" or "Scruton") filed an Opposition (Opp'n, Doc. 37), and Defendants replied (Reply, Doc. 47). Having heard oral argument, and read and considered the parties' papers, the Court GRANTS Defendants' Motion for Summary Judgment.

**II. Background**

The following facts are undisputed and supported by admissible evidence:

ASP is a developer of medical instrument sterilization, disinfection, and cleaning technologies. A division of Ethicon and one of Johnson & Johnson's ("J&J") operating companies, it is located in Irvine, California. In 2006, Plaintiff sought and obtained a position at ASP as a "Facilities Engineer." (Wilson Decl. ¶ 7, Doc. 35; Wilson Decl. Ex. 17, Doc. 35-3; Gethers Decl. ¶ 7, Doc. 35.) Plaintiff was an at-will employee. (Defs.' Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), ¶ 1, Doc. 34.)

In 2009, Plaintiff was hired into ASP's Supply Chain Department as a "Strategic Sourcing Specialist." (Gethers Decl. ¶¶ 8-10; Scruton Decl. ¶ 7, Doc. 40.) At that time, Gregory D. Gethers ("Gethers") was the director of the department. (Gethers Decl. ¶ 8.) Paula Ketelaar ("Ketelaar"), then the group manager of procurement, acted as Scruton's direct supervisor; she, in turn, reported directly to Gethers. (*Id*. ¶ 11.)

In or around 2010 to 2011, J&J began a consolidation of the supply chain departments in its various medical device and diagnostic ("MD&D") companies – including ASP's Supply Chain Department. (*Id*. ¶ 12.) On January 22, 2010, J&J's Chairman and Chief Executive Officer sent an email to all J&J employees outlining the

Case 8:11-cv-01148-JST -MLG   Document 55   Filed 09/12/12   Page 3 of 20   Page ID
#:1075

purpose behind the restructure and consolidation of the various supply chain departments in its many operating companies. (*Id.* ¶ 13; *Id.* Ex. 2, Doc. 35-1.) In pertinent part, that email communicated that "[i]n order to better serve [its] customers, and to address the growing complexity of [its] supply chain systems, [J&J would be] transitioning to an enterprise-wide coordination of [its] supply chains." (*Id.*, Exh. 2.) The email emphasized that J&J's "supply chain must become more effective and efficient and improve the customer's experience in doing business with the [J&J] companies[, which] will require standard practices and common metrics across the enterprise." (*Id.*) In Fall 2010, J&J distributed an email to its MD&D employees summarizing events in the first three quarters of the year, which indicated that J&J was "making good progress toward building a fully integrated global supply chain organization, with the *first two levels of the organization supporting MD&D now defined* and more than 50 new positions filled." (Gethers Decl. ¶¶ 15-16; Gethers Decl. Ex. 3 at 3.)

On November 17, 2010, MD&D employees were provided a memorandum summarizing the MD&D global supply chain consolidation efforts and purpose. (Gethers Decl. ¶ 18; Gethers Decl. Ex. 4, Doc. 35-1.) That memorandum stated that "[t]he MD&D supply chain function is being consolidated end-to-end across seven commercial franchises to reduce complexity, variability and fragmentation to [J&J's] approaches to quality, sourcing, manufacturing, systems, customer logistics, best practice sharing and talent management." (*Id.* Ex. 4 at 1.) It also relayed that J&J would "consolidate and streamline structures further to gain leverage, eliminate redundancy and create new capabilities and opportunities for growth[,]" and that the company was "working toward completing the organizational assessment, design and selection for positions in the remainder of the organization by mid-year 2011." (*Id.* Ex. 4 at 3.)

As part of this restructuring, both Gethers and Ketelaar had their positions eliminated, though they each obtained subsequent employ within the new MD&D supply chain organization. In January 2011, Gethers was notified that his ASP position was being

eliminated, and in March 2011, he obtained the position of Director of External Operations with MD&D Services, Inc., which was at a lower salary band/range than his previous title; in that position, he became responsible for third-party supplier management at ASP, Biosense Webster, and Ethicon Endo-Surgery. (Gethers Decl. ¶¶ 19, 20.) At around this same time, Ketelaar's position as ASP's group manager of procurement was eliminated, though she obtained the position of Contracts Manager within the restructured MD&D company, a position in which she no longer supervised any employees. (*Id.* ¶¶ 20, 32; Ketelaar Decl. ¶¶ 1, 6, Doc. 48.)

In his new position, Gethers was told that he could maintain his existing headcount even though his department would now manage three companies, and he was given discretion to decide how to fill those positions in a manner consistent with the MD&D restructuring goals. (Gethers Decl. ¶ 20.; Supp. Gethers Decl. ¶ 12.) As a result, Gethers decided, *inter alia*, to eliminate the Strategic Sourcing Specialist position held by Scruton and replace that position with the higher level Contract Account Manager position. (Gethers Decl. ¶¶ 21-26.) The Strategic Sourcing Specialist position no longer exists in the new MD&D supply chain organization. (Defs.' SUF ¶ 2.)

In accordance with J&J's human resources protocol for the restructuring, a comparison of the official job duties of the Strategic Sourcing Specialist position to the duties for the Contract Account Manager position was completed in April 2011 by Gethers and ASP Human Resources personnel Bridget Gilmore ("Gilmore") and Morris Wilson ("Wilson"); under this protocol, if the job duties for the new position overlapped by 50% or more with an incumbent's prior position, the incumbent would automatically be transferred into the new position. (Gethers Decl. ¶¶ 28-29; Wilson Decl. ¶¶ 14-16.) Gethers, Gilmore, and Wilson determined that there was only a 25% overlap in the job duties of Strategic Sourcing Specialist and Contract Account Manager. (Gethers Decl. ¶¶ 29-30; Wilson Decl. ¶¶ 14-17; Wilson Decl. Ex. 6, Doc. 35-1; Wilson Decl. Ex. 18, Doc. 35-4.) As a result, the new Contract Account Manager position was to be posted on a J&J

internal database so that all MD&D employees, including Plaintiff, could apply for it. (Wilson Decl. ¶¶ 16, 24.)

In a J&J PowerPoint, human resources was informed of the procedure to notify employees impacted by the restructuring. (*Id*. Ex. 7, Doc. 36-1.) That PowerPoint indicated that all impacted employees had to be notified of their position eliminations by April 27, 2011, with the notification relaying that such employees should apply for new positions in the organization and would be provided severance packages if they could not secure new jobs by May 27, 2011. (*Id*. Ex. 7 at 92.) The PowerPoint further directed that a human resources person and the employee's manager should communicate the employee's elimination by an in-person meeting or telephone. (*Id*. Ex. 7 at 93.)

On April 27, 2011, Gethers, via telephone (he was in New Jersey for work), and Wilson, in-person, communicated to Plaintiff that his position was being eliminated, that he had until the end of May to locate a new job within J&J, and that he should avail himself of the available positions within the MD&D organization. (Gethers Decl. ¶¶ 34-36; Wilson Decl., ¶¶ 23-24.) Plaintiff was one of 77 individuals in seven J&J operating companies, including another ASP employee, affected by this stage of the restructuring. (Brown Decl. ¶¶ 4, 14, Doc. 35; Brown Decl. Ex. 15, Doc. 35-3.) Tiffany Shaw, an ASP supplier manager, likewise had her position eliminated as part of the restructuring, though she obtained subsequent employ elsewhere in the MD&D organization. (Wilson Decl. ¶ 19; Supp. Wilson Decl. ¶ 3, Doc. 48; Supp. Wilson Decl. Ex. 31, Doc. 48-1 (employer human resources emails dated April 20, 2011, reflecting Scruton's and Tiffany Shaw's positions slated for elimination and script for communicating information).)

Scruton ultimately applied for the open Contract Account Manager position in Irvine. (Gethers Decl. ¶ 39; Scruton Decl. ¶ 28.) Plaintiff was one of four J&J employees who applied for the position, though two of those candidates withdrew from consideration. (Gethers Decl. ¶¶ 40, 43.) Scruton completed a phone interview for that position with Gethers and John Washington ("Washington"), then director of research and development

5

for the high-level disinfection segment of ASP. (*Id.* ¶¶ 41-42.) Neither Scruton nor the other remaining J&J candidate obtained the Contract Account Manager position; that position remained unfilled until April 2012. (*Id.* ¶¶ 43-44.) Scruton also was unable to secure employment in any other available MD&D positions, and as a result, July 8, 2011, was his last day with ASP. (*Id.* ¶ 48; Scruton Decl. ¶ 31.)

In late February 2011, prior to learning of the elimination of his ASP position, Plaintiff applied for National Guard duty and status and contacted ASP's Human Resources regarding whether, and on what terms, ASP would allow him to take National Guard leave. (Scruton Decl. ¶ 10; Scruton Decl. Ex. 104, Doc. 40-1; *see also* Wilson Decl. ¶¶ 31-32; Wilson Decl. Exs. 23-24, Doc. 35-4.) Sometime shortly thereafter, Human Resources communicated that information to Ketelaar, who then drafted a March 2, 2011, email to Gethers stating the following:

> Just a quick heads up that Bridget Gilmore in Human Resources contacted me today regarding a meeting scheduled with Chris Scruton. He is gathering facts around the company's military leave policy and may be joining the reserves. Our policy supports 17 days per year leave and will make the employee financially whole during this leave. The first year of the reserves would require a 5 week training period then 1 weekend per month in Florida. Each year thereafter, he is required to take 2 weeks of training and 1 weekend per month in Florida.
>
> He has requested that ASP support a Friday off every month to support traveling to Florida. Bridget and Morris reviewed this request and their position is that Chris would be required to take a vacation day, floating holiday or work/family day (5 days per year).
>
> Anyway, just wanted to give you notice so that we can discuss [the] best way to resource his workload.

(Gethers Decl. ¶ 52; Gethers Ex. 13, Doc. 35-3; Scruton Decl. ¶ 11; Scruton Decl. Ex. 105, Doc. 40-1.) Plaintiff never submitted a request for military leave of absence under ASP's written military leave policy. (Wilson Decl., ¶ 33.) On or prior to Scruton's April 27, 2011, position elimination notification (and other than receiving the March 2, 2011, email

from Ketelaar), Gethers did not communicate with either Scruton or anyone else at ASP, including Ketelaar, about Scruton potentially joining the National Guard, and Gethers never learned whether Scruton actually applied to or became a member of the National Guard.  (Gethers Decl. ¶¶ 52-53.)

On September 19, 2011, Plaintiff filed the operative First Amended Complaint ("FAC"), which alleges a single claim against Defendants for violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311, et seq. – retaliation and discrimination against Plaintiff for National Guard service. (Doc. 19.)  Plaintiff asserts that Defendants were motivated to terminate his position because of his inquiries regarding leave for National Guard service.  (FAC ¶ 3.)

### III. Legal Standard

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and quotation marks omitted).  The burden then shifts to

the non-moving party to "cit[e] to particular parts of materials in the record" supporting its assertion that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor").

**IV. Discussion**

"USERRA 'prohibit[s] discrimination against persons because of their service in the uniformed services.'" *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citations omitted). An employer violates USERRA "when a person's 'membership, application for membership, service, application for service, or obligation for service in the uniformed services is a *motivating factor* in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.'" *Id.* (quoting 38 U.S.C. § 4311(c)(1)) (emphasis in original). Thus, in evaluating Defendants' Motion, the Court must determine: "(1) whether there is sufficient evidence from which a jury could find that [Plaintiff's National Guard] status or conduct was a substantial or 'motivating factor' in [Defendants'] decision to terminate his employment; and (2) if there is such evidence, whether [Defendants have] established as an uncontroverted fact that [they] would have terminated his employment even if he had not [applied to be] a member of the [National] Guard." *Id.* at 899.

In particular, Defendants argue that the undisputed, material facts show that they are entitled to summary judgment or partial summary judgment for four reasons. First, they contend that Plaintiff cannot meet his burden of proof to show that his interest in the National Guard was a substantial or motivating factor in the termination of his employment. Second, they urge that his discrimination claim is barred by the "same actor" doctrine. Third, they assert that even if Plaintiff could meet his burden to show

discriminatory motive, the undisputed, material facts show that Defendants would have made the same legitimate business decision to eliminate his "Strategic Sourcing Specialist" position even absent his interest in the National Guard. Finally, they argue that Plaintiff cannot show that he is entitled to any damages because he failed to mitigate his damages by seeking comparable employment and cannot show that Defendants acted willfully.

Plaintiff responds that Defendants' Motion must be denied in its entirety because triable issues of fact exist as to all Defendants' arguments. He also contends that credibility issues make summary judgment inappropriate in this case.

a. *Plaintiff has failed to show that there is a triable issue of fact regarding whether his inquiry about National Guard leave was a motivating factor in ASP's termination of his employment.*

Under USERRA, Plaintiff has the burden of proving discriminatory motive. *Leisek*, 278 F.3d at 899. "[D]iscriminatory motivation of the employer 'may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between proffered reason[s] and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.* at 900 (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)); *see also Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (5th Cir. 2005) ("[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration.") (internal quotations and citation omitted). In evaluating motive, "[t]he court may consider all record evidence, including the employer's explanation for the actions taken." *Leisek*, 278 F.3d at 900 (internal citation an quotation marks omitted).

Case 8:11-cv-01148-JST -MLG   Document 55   Filed 09/12/12   Page 10 of 20   Page ID
#:1082

As a preliminary matter, Plaintiff provides no direct evidence tending to show that his inquiry regarding National Guard leave motivated Gethers or others at ASP to eliminate his position. Instead, Plaintiff claims that he has presented sufficient circumstantial evidence speaking to the above *Leisek* factors to withstand summary judgment on the issue of Defendants' discriminatory motive. The Court disagrees.

First, Plaintiff has provided no admissible evidence tending to show that Gethers or anyone else at ASP expressed hostility towards employees applying for National Guard leave or employees otherwise protected under USERRA. Even looking at the May 2, 2011 email in the light most favorable to Plaintiff, the text of that email does not reflect that Ketelaar, Gethers, or anyone in ASP's human resources frowned upon or took issue with Gethers taking National Guard leave at some point in the future. Indeed, Ketelaar's legitimate concern that ASP might have to resource Plaintiff's work load in the event that he obtained a position with the National Guard cannot be interpreted as nefarious. (Gethers Decl. ¶ 52; *Id.* Ex. 13; Scruton Decl. ¶ 11; *Id.* Ex. 105.)

Moreover, Plaintiff's conclusory assertion in his declaration that human resources was initially resistant to the prospect of him taking National Guard leave is not supported by any evidence in the record. (*See*, *e.g*., Scruton Decl. ¶ 15; *Id.* Ex. 107); *Kung v. FOM Inv. Corp*., 563 F.2d 1316, 1318 (9th Cir. 1977) (recognizing that conclusory allegations unsupported by underlying facts do not create triable issues of material fact); *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 345 (9th Cir. 1995). Scruton relies on the email from human resources personnel Gilmore for his conclusion that ASP was resistant to his request for leave; however, in that email, Gilmore merely refers to the terms of ASP's military leave policy and relates that Scruton will have to use vacation days towards travel time associated with potential National Guard training. (Scruton Decl. ¶ 15; *Id.* Ex. 107.) Even looking at these facts in the light most favorable to Plaintiff, they do not suggest that ASP was resistant to military leave, especially

considering Plaintiff provides no evidence that ASP's military leave policy generally or its position regarding travel time specifically ran afoul of USERRA.

Plaintiff also attempts to show a triable issue of fact by pointing out that, sometime in 2009, Gethers stated that Plaintiff had no "operations experience" and when Plaintiff referenced his military operations background, Gethers responded that that was "different." (Scruton Decl. ¶ 13.) Not only is this single comment removed by almost two years from the ultimate decision to eliminate Plaintiff's position, it also cannot easily be read as disparaging of Plaintiff's military background. In other words, Plaintiff fails to dispute that operations in the context of an MD&D company does not necessarily parallel operations in the military context. And Plaintiff provides the Court with no details related to Gethers' comment – other than Gethers' use of the word "different" – that suggest Gethers did not value or harbored hostility towards individuals with military experience. *Compare Staub v. Proctor Hosp.*, --- U.S. ----, 131 S. Ct. 1186, 1189 (2011) (noting that veteran's supervisors "were hostile to [his] military obligations" and cataloging supervisors' actions and derogatory comments showing hostility). Other "hostility" facts that Plaintiff tries to rely on, such as Gethers' failure to ever have lunch with Plaintiff (Scruton Decl. ¶ 26), are not tethered in any way to Plaintiffs' protected status and do not support an inference that Gethers harbored hostility towards Plaintiff because of his interest in the National Guard.

Regarding both the decision to eliminate Plaintiff's position and his inability thereafter to get rehired within the reorganized MD&D conglomerate, Plaintiff has failed to present sufficient evidence demonstrating (1) inconsistencies between Defendants' proffered reasons for their actions or (2) disparate treatment of Plaintiff in comparison to other employees with similar work records, either of which would suggest a discriminatory motive.

As to the initial decision to eliminate the Strategic Sourcing Specialist position, Plaintiff does not point the Court to any specific evidence showing an inconsistency

11

between ASP's proffered reason for eliminating the Strategic Sourcing Specialist position – the needs of restructuring – and other conduct Gethers and ASP engaged in as part of the restructuring. Indeed, Plaintiff has not – either in his papers or during oral argument – and cannot dispute that his was not the only ASP position eliminated as part of the restructuring. Instead, the position of Supplier Manager, filled by Tiffany Shaw, was likewise eliminated in the restructuring at the same time as Plaintiff's position, and both Ketelaar and Gethers lost their positions in prior phases of the restructuring. (Gethers Decl. ¶¶ 34-36; Ketelaar Decl. ¶¶ 1, 6; Wilson Decl. ¶¶ 19, 23-24; Supp. Wilson Decl. ¶ 3, Ex. 31) Moreover, across the entire J&J conglomerate, 77 positions were affected at the same time as Plaintiff's position. (Brown Decl. ¶¶ 4, 14 Exh. 15.)

Relatedly, Plaintiff points to no evidence suggesting that, respecting the decision to eliminate his position, he was treated in a disparate manner compared to other similar ASP employees. The Court recognizes that Plaintiff was the only person in ASP's Supply Chain Department filling the role of Strategic Sourcing Specialist. However, Plaintiff rests much of his case on his opinion that he was actually completing the higher level duties of a Supplier Manager, notwithstanding his title. (Scruton Decl. ¶ 8; *Id.* Ex. 103, Doc. 40-1.) Admittedly, Defendants provide some inconsistent evidence regarding whether "Supplier Manager" reflects an official ASP job title.[1] *However*, it remains undisputed that the only

---

[1] In response to Plaintiff's exhibit 103, a chart listing him (among other individuals) as "Supplier Manger," Defendants contend in their reply briefing that "Supplier Manager" on that chart does not refer to an official job but simply is used there as a descriptive title. Defendants also seem to imply that the term "Supplier Manager" does not refer to *any* job title at ASP. However, this latter position is belied by evidence in Defendants' moving papers, namely that Tiffany Shaw, expressly identified as a Supplier Manager, was terminated. Moreover, Gethers' deposition testimony, cited by Plaintiff at his exhibit 133, also refers to Supplier Managers as specific positions, though that testimony *does not* support Plaintiff's implied claim that Supplier Managers performed duties coextensive with Contract Account Managers. (*See*, *e.g.*, Pl.'s Ex. 133 at 17:12-16, Doc. 45 (in reference to the restructuring, stating that, "this was not a situation where individuals were moved into a new title. This was a situation where, when a position became open, we chose to fill it with a contract account manager individual, *as opposed to* a supplier manager.") (emphasis added).)

Supplier Manager identified by name to the Court, Tiffany Shaw, likewise had her position eliminated in the restructure. (Wilson Decl. ¶ 19; Supp. Wilson Decl. ¶ 3, Ex. 31.) Such an undisputed fact undermines any inference that Scruton should not have had his position eliminated because he was actually functioning as a Supplier Manager. Moreover, Plaintiff presents no evidence that Supplier Manager positions were added as part of the MD&D reorganization or that any existing Supplier Manager positions in the ASP Supply Chain survived the MD&D reorganization. Indeed, when asked at oral argument to clarify what evidence he has suggesting he was treated in a different manner than other similarly situated employees, Plaintiff failed to point the Court to any admissible evidence in the record. In the absence of such facts, Plaintiff has not shown that he was treated disparately from like ASP or J&J employees respecting the decision to eliminate his position.

Similarly, Plaintiff makes much of the fact that he was the only person in ASP's Supply Chain Department who had his position eliminated but was not thereafter rehired into a comparable position as part of the restructuring. Indeed, it is undisputed that Plaintiff applied for but did not secure the Contract Account Manager position that became available as a result of the elimination of his job. (Gethers Decl. ¶¶ 43-44; Scruton Decl. ¶ 28.) Moreover, it is undisputed that Plaintiff applied for but did not obtain at least three other positions at an affiliated J&J operating company, Biosense Webster. (Scruton Decl. ¶ 26.) Plaintiff does not indicate to the Court if Gethers, Washington, and/or ASP gave him any explanation for their decision not to hire him for the Contract Account Manager position. Admittedly, Scruton may never have been provided with such an explanation, so there is no basis for this Court to evaluate whether any proffered explanation was inconsistent with other employer conduct. The Court would not use this lack of evidence against Plaintiff.

However, Plaintiff argues that he was treated less favorably than other ASP employees simply because he failed to secure a new position. The undisputed facts do not lend themselves to such an inference. First, Plaintiff does not dispute that Defendants used

13

1  a protocol whereby incumbents who had their positions eliminated were automatically
2  placed into newly created positions only if there was more than a 50% overlap in job duties
3  and that incumbents otherwise were free to apply for such new positions if they were not
4  automatically moved into them. (Gethers Decl. ¶¶ 28-29; Wilson Decl. ¶¶ 14-16.)
5  Moreover, Plaintiff does not dispute that the official job duties of Strategic Sourcing
6  Specialist overlapped only 25% with the job duties of Contract Account Manager, and it is
7  undisputed that Plaintiff was able to and did apply for the Contract Account Manager
8  position in accordance with J&J's protocol. (Gethers Decl. ¶¶ 29-30; Wilson Decl. ¶¶ 14-
9  17; Wilson Decl. Exs. 6, 18.)

10       In addition, assuming Plaintiff was actually functioning as a Supplier Manager, he
11 provides the Court with no admissible evidence related to or describing the job duties of a
12 Supplier Manager; nor does he ever contend that such duties overlap at least 50% with the
13 duties of a Contract Account Manager, such that he should have automatically obtained the
14 position of Contract Account Manager without having to apply for the job. Likewise,
15 Plaintiff provides the Court with no evidence suggesting that the other identified
16 employees who secured reemployment (e.g., Gethers, Ketelaar, Tiffany Shaw) were hired
17 outside of Defendant's protocol. Plaintiff, for example, does not submit admissible
18 evidence showing that other individuals who were functioning as Supplier Managers (or
19 filled some other lower-level roles) were automatically placed into positions as Contract
20 Account Managers (or other higher-level positions). Indeed, there is no evidence that
21 Tiffany Shaw, the terminated Supplier Manager, was rehired as a Contract Account
22 Manger, and the undisputed evidence shows that the at-issue Contract Account Manager
23 position was not filled until April 2012, despite another J&J employee applying for the
24 position at the same time as Plaintiff.[2] (Gethers Decl. ¶ 44.) And again, when asked at
25
26    [2] The Court notes that Plaintiff makes passing reference in his declaration to all other
27 Supplier Managers he worked with being "re-titled" as Contract Account Managers before he was terminated. (Scruton Decl. ¶ 19.) Defendants object to Plaintiff's use of the word "re-titled" as
28    (footnote continued)

14

oral argument to explain what evidence shows he was treated differently than other like employees in the rehiring process, Plaintiff's counsel failed to answer the Court's question directly or to identify any facts suggesting that his failure to secure reemployment evidences discriminatory motive on the part of Defendants.

Plaintiff also provides the Court with no details surrounding his applications for the three positions at Biosense Webster, such that the Court can make any inference that his failure to obtain those positions evidences discriminatory motive. To summarize, Plaintiff has identified insufficient facts surrounding his failure to obtain reemployment from which a reasonable jury could conclude that he was treated differently from similarly situated J&J employees. Nor has Plaintiff provided sufficient facts that would allow a reasonable jury to conclude that Defendants' failure to rehire him evidences that Gethers had a discriminatory motive when eliminating the Strategic Sourcing Specialist position in the first place.

Thus, considering the dearth of evidence presented by Plaintiff speaking to most of the *Leisek* factors, his entire USERRA discrimination case rests on the temporal proximity between his inquiry about National Guard leave and the ultimate decision to terminate the Strategic Sourcing Specialist position. In the context of this particular USERRA claim, and especially in light of the substantial, undisputed evidence regarding the global consolidation and restructuring of J&J's supply chain departments which began as early as

---

vague and ambiguous and otherwise contend that Plaintiff's statement is not clearly based on personal knowledge and lacks foundation. (Doc. 50 at 18 ¶ 15.) The Court agrees. Plaintiff does not identify any particular individuals who moved from Supplier Manager positions to Contract Account Manager positions or the basis of his knowledge related to the details of such "re-titling." Indeed, in his other statements regarding Tiffany Shaw (which are often ambiguous, not clearly based on personal knowledge and appear to lack foundation, as argued by Defendants), he never claims that she automatically (or ever) became a Contract Account Manager. Thus, this single sentence lacking in any detail cannot create a triable issue of fact.

2010, the Court finds that temporal proximity alone is not sufficient for Plaintiff to withstand summary judgment.[3]

While the Ninth Circuit has not addressed whether temporal proximity by itself is enough to establish discriminatory motive and withstand summary judgment in USERRA cases, the First Circuit has found it insufficient. *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 29 (1st Cir. 2010) (granting summary judgment for employer because, "[o]ther than proximity in time, [employee had] not come forth with any evidence that his military status was a motivating factor in [employer's adverse employment action]"; noting that "proximity in time, . . . [while] a factor for consideration, [] alone is not sufficient" to make out a USERRA claim). In the USERRA context, the Fourth Circuit has also acknowledged that an employee's evidence of temporal proximity alone will not suffice to withstand summary judgment where the employer's conduct relevant to the ultimate termination decision significantly precedes the employee's protected activity. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise[;]" granting summary judgment on USERRA retaliation claim where exclusive evidence of discriminatory motive was 3-month temporal proximity between protected conduct and adverse employment action) (internal quotations and citation omitted). Here, while the decision to terminate Plaintiff's position and the ultimate termination occurred at most two months after Plaintiff inquired about National Guard leave, Defendants'

---

[3] The Court recognizes that, in their reply brief, Defendants argue for the first time that they made the decision to eliminate Plaintiff's position prior to his protected activity. That is, they claim that a February 24, 2011 outline purporting to reflect the organizational restructure no longer lists a Strategic Sourcing Specialist position. (Suppl. Brown Decl. ¶ 5, Doc 48; *Id.* Ex. 28, Doc. 48-1.) Because that outline precedes the March 2, 2011 email to Gethers from Ketelaar communicating Plaintiff's inquiry about National Guard leave, they argue that the document shows the decision to eliminate Plaintiff's position occurred before Gethers ever knew about Plaintiff's protected activity. The Court does not rely on such evidence, not submitted until the reply, to conclude that Defendants' Motion should be granted.

activities requiring a downsizing of the department in which Plaintiff worked began well over a year before his inquiry into National Guard leave, undermining the significance of the arguably close timing in this case between Plaintiff's protected activity and his ultimate termination.

And while the Ninth Circuit has not expressly addressed whether timing evidence alone will suffice to withstand summary judgment under USERRA, in related employment contexts it has acknowledged that the significance of timing evidence depends on the facts and circumstances of the particular case. *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003); *see also Knight v. Brown*, No. 11-35592, 2012 WL 2365904, at *1 (9th Cir. June 22, 2012) (affirming grant of summary judgment for employer in Title VII case because employee's "reliance on temporal proximity and unsubstantiated, subjective statements" was not enough); *Burgener v. Union Pac. Corp.*, No. C 07-5160 JF (HRL), 2009 WL 1082356, at *13 (N.D. Cal. Apr. 22, 2009) (granting summary judgment on USERRA claim where temporal proximity between protected conduct and termination was approximately one month; acknowledging that temporal proximity in some cases might be used to survive summary judgment, but holding substantial evidence demonstrated that employee was terminated for valid-nondiscriminatory reasons).  With these authorities in mind and in light of the overwhelming, undisputed evidence that the global restructuring of J&J's MD&D supply chain departments began well before Plaintiff's protected activity, the Court finds that Plaintiff cannot rest his USERRA case simply on the close timing between his inquiry about National Guard leave and the ultimate elimination of his Strategic Sourcing Specialist position.

Thus, Defendants have shown they are entitled to summary judgment on Plaintiff's single claim for violation of USERRA.

*b. Defendants have established as an uncontroverted fact that ASP would have eliminated Plaintiff's "Strategic Sourcing Specialist" position even if he had not applied to be a member of the National Guard.*

"[U]nder USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was *not* a pretext; that is, that 'the [termination decision] *would* have been taken in the absence of [the employee's military] service.'" *Velazquez-Garcia v. Horizon Lines of P.R., Inc.*, 473 F.3d 11, 17 (1st Cir. 2007) (emphasis in original) (citing 38 U.S.C. § 4311(c)).[4]

Here, even if the Court were to find that Plaintiff has established a triable issue of fact regarding discriminatory motive based on his timing evidence, the undisputed facts demonstrate that Defendants would have eliminated the Strategic Sourcing Specialist position *even if* Plaintiff had never inquired about National Guard leave. For example, it is undisputed that as part of the restructuring, Gethers became responsible for third-party supplier management of three companies, i.e., two companies in addition to ASP (Biosense Webster and Ethicon Endo-Surgery). (Gethers Decl. ¶ 20.; Supp. Gethers Decl. ¶ 12.) While it is undisputed that Gethers was not told he had to eliminate any particular position in his new role managing supplier management for three companies, it is also undisputed that he was not allowed to increase his headcount to accommodate his increased workload. (*Id.*) Plaintiff likewise does not dispute that his *official* job title was Strategic Sourcing Specialist, and that the role of Contract Account Manager is a more sophisticated supply management position. (Scruton Decl. ¶ 8; Gethers Decl. ¶ 20.)

---

[4] In their reply briefing, Defendants incorrectly suggest that Plaintiff has the burden of showing pretext. However, the burden-shifting scheme under USERRA requires them to show conclusively that they would have engaged in the challenged conduct despite Plaintiff's protected activity. Nonetheless, the Court still finds that Defendants have set forth sufficient, uncontroverted evidence to meet their burden.

Nor does Plaintiff dispute that Gethers and J&J legitimately would have wanted to task the new restructured supply chain organization with higher level positions to meet the greater work demands inherent in serving multiple operating companies. *See Barreto v. ITT World Directories, Inc*., 62 F. Supp. 2d 387, 393 (D. P.R. 1999) (granting summary judgment for employer where undisputed that "plaintiff's discharge was not an isolated event [but] part of [employer's] effort to make its operation more effective[,]" and six other employees were discharged for similar reasons); *Figueroa Reyes v. Hosp. San Pablo del Este*, 389 F. Supp. 2d 205, 211-12 (D. P.R. 2005) (noting that an employer should not be liable under USERRA where it "ha[s] legitimate business reasons for its decision, such as a *diminished need for services* or lack of qualification. . . .") (emphasis added). Neither is there any admissible evidence suggesting that the disputed role of Supplier Manager was comparable in skill-set and sophistication to that of Contract Account Manager or suggesting that Plaintiff was actually performing the tasks of a Contract Account Manager notwithstanding his title. Indeed, while Plaintiff includes in his declaration his understanding that he excelled in his duties at ASP (Scruton Decl., ¶ 9), it is undisputed that Ketelaar completed performance reviews for Plaintiff well before his protected activity that placed his work quality at 4 and 5 on a 9-point scale (i.e., average performance). (Wilson Decl. ¶ 11; *Id.* Ex. 10, Doc. 35-2.)

In other words, Defendants have presented sufficient, uncontroverted evidence that they would have eliminated the Strategic Sourcing Specialist position even if Plaintiff had never inquired about National Guard leave. It is undisputed that the Strategic Sourcing Specialist position has never been reinstated as part of the reorganized MD&D supply chain operations. (Defs.' SUF ¶ 2.) In addition, it is undisputed that Plaintiff had the same opportunities as other J&J MD&D employees to seek reemployment within the organization, including applying for the at-issue Contract Account Manager position. With the above in mind, the Court finds that Defendants are also entitled to summary judgment for this additional reason. *See Coyaso v. Bradley Pac. Aviation, Inc*., 2012 WL

19

1580470, at *8 (D. Haw. May 3, 2012) ("Turning to this action, the court finds that even if Plaintiff can establish that his military status was a motivating factor in Defendant's termination decision, Defendant has established as a matter of law that it would have terminated Plaintiff without regard to Plaintiff's protected status.")

    c. *The Court need not reach the parties' additional arguments or fully rule on their evidentiary objections.*

Based on the above findings by the Court, it refrains from reaching Defendants' additionally advanced arguments in support of summary judgment or partial summary judgment.  Moreover, in reaching its outcome, the Court has not relied on the statements and evidence objected to by Plaintiff or otherwise finds Plaintiff's objections without merit. (Docs. 39, 52.)  Likewise, the Court has addressed Defendants' objections to Plaintiff's evidence when necessary, and its ruling otherwise moots those objections not expressly addressed herein.  (Doc. 50.)

**V. Conclusion**

For the foregoing reasons, the Court GRANTS Defendants' Motion.  Defendants are ORDERED to prepare and submit a proposed judgment consistent with this Order forthwith.  The Final Pretrial Conference, Exhibit Conference and Jury Trial dates are ordered vacated from the Court's calendar.

DATED: September 12, 2012

                                             JOSEPHINE STATON TUCKER
                                             UNITED STATES DISTRICT JUDGE